Julian FORD, Appellant,

v.

CHARTONE, INC., Appellee.

No. 04–CV–1193.

District of Columbia Court of Appeals.

Argued Oct. 6, 2005.

Decided Sept. 28, 2006.

William C. Claiborne III, with whom Sean R. Day, was on the brief, for appellant.

John T. Hugo, with whom Jennifer B. Furey, Boston, MA and Jonathan L. Abram, Washington, DC, were on the brief, for appellee.

Before GLICKMAN and KRAMER, Associate Judges, and PRYOR, Senior Judge.

GLICKMAN, Associate Judge:

Appellant Julian Ford sought to maintain a consumer class action lawsuit against appellee ChartOne, Inc., a company that contracts with health care providers to handle all the requests that they receive for copies of patient medical records. Ford complained that ChartOne abused its delegated authority by charging requestors unconscionably high fees, in violation of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C.Code §§ 28–3901 to –3911 (2001). The trial court denied Ford's motion for class certification, finding that he did not satisfy the requirements for a class action set forth in Superior Court Civil Rule 23. Thereafter, the court awarded summary judgment to ChartOne on Ford's remaining individual cause of action under the CPPA on the ground that Ford did not purchase his own medical records from ChartOne for a consumer purpose.

We reverse both rulings. Addressing them in reverse order, we hold that Ford engaged in a consumer transaction subject to the protections of the CPPA, and that he met the requirements for bringing a class action under Rule 23(b)(3).

## I.

ChartOne contracts with hospitals and other health care providers in the District of Columbia and elsewhere to process the requests they get for personal medical records from patients, patient representatives, and others. In response to each request, ChartOne goes through a series of steps to confirm that the requestor has furnished the necessary authorizations and consents to the release of the records, to locate and identify those records, to copy and mail them to the requestor, and to document the foregoing activity. If the records contain sensitive or highly confidential patient information, such as details about treatment for drug use, mental health problems, or HIV/AIDS, state and federal laws require ChartOne to take extra measures to ensure that release of the records is authorized. ChartOne describes the retrieval and production procedures it must follow as "highly detailed, time con-

suming and complex, as there are countless variations involved with any single information request and ChartOne bears the risk of improper release of confidential information...." Brief of Appellee at 5. In exchange for its services, ChartOne charges requestors certain standardized fees. To obtain patient records from health care providers that have hired ChartOne, requestors must agree to pay those fees; they cannot avoid dealing with the company by obtaining the records directly from the providers.

In 2002, Ford authorized his attorney to request his medical records from Washington Hospital Center, where Ford had been treated in April 2001. Ford needed the medical records for a personal injury lawsuit he had initiated against the District of Columbia and several of its police officers. The Washington Hospital Center forwarded Ford's request to ChartOne, which eventually produced six pages of records. For this service, ChartOne charged $1.10 per page, plus a $25.00 "clerical fee," a fifteen percent surcharge for shipping and handling, and tax, for a total fee of $38.16 (or, as Ford puts it, $6.36 for each page of his records that he received). Ford's attorney paid ChartOne's invoice, treating the payment as an advance of litigation costs. When the personal injury lawsuit later was settled, the advance was deducted from Ford's recovery as an amount he owed his attorney.

Thereafter, in August 2002, Ford filed the instant lawsuit in Superior Court, seeking relief under the CPPA on the ground that the fees ChartOne assessed him and other patients of health care facilities in the District of Columbia [1] were so high as to be unconscionable. The complaint contrasted ChartOne's fees in the District of Columbia with the substantially lower fee, approximately $.52 per page, that the company allegedly charged in the surrounding jurisdictions of Maryland and Virginia.[2] Ford invoked D.C.Code § 28–3904(r), which makes it an unlawful trade practice under the CPPA to "make or enforce unconscionable terms or provisions of sales or leases."

Ford undertook to bring this lawsuit as a class action on behalf of all residents of the District of Columbia who, from August 1999 through the date of any judgment in this case, personally or through an authorized representative, requested and paid more than $0.52 per page for copies of their medical records from a District health care provider that delegated such requests to ChartOne. The complaint alleged that the lawsuit satisfied the four prerequisites to a class action set forth in subdivision (a) of Superior Court Civil Rule 23,[3] and that it would be appropriate

---

1. According to the complaint, ChartOne has contracts to process medical records requests with Georgetown University Hospital, Howard University Hospital, and The George Washington University Hospital, among other entities, in addition to the Washington Hospital Center.

2. Unlike the District of Columbia, Maryland and Virginia regulate by statute the fees that a health care provider legally may charge for retrieving and copying medical records. *See* MD.CODE ANN., Health–Gen. § 4–304(c)(3) (2006); VA.CODE ANN. §§ 8.01–413(A) & 32.1–127.1:03(J) (2006).

3. Superior Court Civil Rule 23(a) lists the four "prerequisites to a class action" as follows:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

to certify the proposed class under subdivisions (b)(2)[4] and (b)(3)[5] of that Rule. As relief, Ford requested that the court (a) declare that ChartOne had charged illegally unconscionable fees and enjoin it from continuing to do so, (b) order ChartOne to refund the excess portions of the fees it had received from members of the plaintiff class, (c) award the plaintiffs compensatory and statutory treble damages, with interest, and (d) award attorneys' fees and other litigation-related costs. *See* D.C.Code § 28–3905(k)(1).

In due course, Ford moved for class action certification. *See generally* Super. Ct. Civ. R. 23(c) & 23–I(b). The trial court denied the motion. It identified two basic reasons why the lawsuit satisfied neither the prerequisites for a class action listed in Rule 23(a) nor the related requirements for (b)(3) class certification, and a third reason why the action could not proceed under Rule 23(b)(2).

First, the court concluded, Ford's own personal claim against ChartOne did not share questions of law or fact in common with the CPPA claims of the proposed class of consumers, persons who, by statutory definition, had to have purchased medical records from ChartOne "for personal, household, or family use." D.C.Code § 28–3901(a)(2).[6] As the court construed this statutory language, it excluded Ford's individual claim because his attorney had purchased his records for what the court called a "non-consumer purpose," *i.e.*, litigation. Consequently, the court ruled, Ford did not satisfy the fundamental commonality requirement of Rule 23(a)(2) (nor, by implication, the other requirements set forth in subdivisions (a) and (b)(3) of Rule 23).

Second, the court concluded that the analysis of whether ChartOne's fees were unconscionable necessarily would differ for each putative class member, because the process (and hence the cost to the company) of legally releasing medical records "would be unique and different for each patient" depending on the patient's particular medical condition and the medical ser-

---

For convenience, we refer to these four prerequisites as numerosity, commonality, typicality, and adequacy-of-representation.

4. Superior Court Civil Rule 23(b)(2) provides that an action satisfying the prerequisites of Rule 23(a) may be maintained as a class action if

> (2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. . . .

5. Superior Court Civil Rule 23(b)(3) authorizes maintenance of a class action where the Rule 23(a) prerequisites are met and

> (3) The Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) The interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

6. In its entirety, the definition of "consumer" set forth in the CPPA reads as follows:

> (2) "consumer" means a person who does or would purchase, lease (from), or receive consumer goods or services, including a co-obligor or surety, or a person who does or would provide the economic demand for a trade practice; as an adjective, "consumer" describes anything, without exception, which is primarily for personal, household, or family use[.]

D.C.Code § 28–3901(a)(2).

vices that the patient had received. For that reason, the court ruled, Ford satisfied neither the typicality and adequacy-of-representation requirements of Rule 23(a), nor the twin requirements of Rule 23(b)(3) "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy."

Lastly, the trial court further ruled that it would be inappropriate to certify a class under subdivision (b)(2) of Rule 23 for the additional reason that the lawsuit primarily sought money damages rather than injunctive or declaratory relief.

Following Ford's unsuccessful attempt to take an immediate appeal from the trial court's rulings,[7] ChartOne moved for summary judgment on his remaining individual claim. Consistent with its earlier conclusion, the court granted the motion on the ground that Ford was not entitled to the relief he sought under the CPPA because his medical records were not purchased for a consumer purpose. Elaborating on its reasoning, the court explained that

> In the context of this case, litigation is not a consumer purpose. Plaintiff Ford's attorney obtained the medical records so that he could engage in his business of providing legal services and procuring a financial reward for his client. He did not act "as a mere conduit or intermediary, procuring the medical records in order to pass them along for plaintiff's 'personal, family, or household' use." [Quoting *Slobin v. Henry*

*Ford Health Care*, 469 Mich. 211, 666 N.W.2d 632, 635 (2003).]

## II.

Ford challenges both the denial of his class certification motion and the award of summary judgment to ChartOne. Because he must have an individual cause of action of his own to assert before he may be permitted to maintain a class action, we shall address the summary judgment ruling first.

### A. The Propriety of Summary Judgment on Ford's Individual Cause of Action

A trial court should award summary judgment only when the moving party has shown that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Super. Ct. Civ. R. 56(c). We apply the same substantive standard when we review such an award on appeal. *Opton, Inc. v. FDIC*, 647 A.2d 1126, 1128 (D.C.1994) (citation omitted). In the case at hand, the trial court based its decision on its legal conclusion that Ford's purchase of his medical records through his attorney for use in his personal injury lawsuit was not a transaction within the coverage of the CPPA. As this is primarily a question of statutory interpretation, our review is *de novo*. *See Cass v. District of Columbia*, 829 A.2d 480, 482 (D.C.2003).

■ ■ "The District of Columbia Consumer Protection Procedures Act affords a panoply of strong remedies, including tre-

---

**7.** Ford sought to take an immediate appeal from the denial of class action certification pursuant to Superior Court Civil Rule 23(f). We dismissed his petition for lack of jurisdiction, holding that "Rule 23(f) does not authorize this court to permit an interlocutory appeal from the grant or denial of class action certification without the written statement by the trial judge that D.C.Code § 11–721(d) requires." *Ford v. ChartOne, Inc.*, 834 A.2d 875, 881 (D.C.2003). We also rejected Ford's arguments for interlocutory review under either the "death knell" or "collateral order" doctrines. *Id.* at 881–82.

ble damages, punitive damages and attorneys' fees, to consumers who are victimized by unlawful trade practices." *District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 717 (D.C.2003). The protections of the CPPA apply to a wide range of practices and transactions. *See, e.g., DeBerry v. First Gov't Mortg. & Investors Corp.*, 743 A.2d 699, 700–01 (D.C.1999). Nonetheless, the CPPA "was designed to police trade practices arising only out of consumer-merchant relationships," *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C.1981), and does not apply to commercial dealings outside the consumer sphere. *See, e.g., Mazanderan v. Independent Taxi Owners' Ass'n*, 700 F.Supp. 588, 591 (D.D.C.1988) (holding that a taxicab operator's purchase of gasoline and supplies was not a consumer transaction within the coverage of the CPPA because it was made "in connection with his role as an independent businessman"); *Independent Commc'ns Network, Inc. v. MCI Telecomms. Corp.*, 657 F.Supp. 785, 787 (D.D.C.1987) ("[The CPPA] is not intended to supply merchants with a private cause of action against other merchants."). Thus, civil actions under D.C.Code § 28–3905(k)(1), the provision of the CPPA pursuant to which Ford sued ChartOne, may

be brought only by (or on behalf of) aggrieved consumers.[8] In other words, as the trial court in this case correctly recognized, a valid claim for relief under the CPPA must originate out of a consumer transaction.

The trial court's precise rationale for holding that the purchase of Ford's medical records was not a consumer transaction is, arguably, unclear. As Ford sees it, the court erroneously based its decision on a determination that Ford's attorney was the purchaser rather than Ford himself. ChartOne, on the other hand, asserts that the decision "did not rest on a determination of who purchased the medical records .... [and the] question of who was the real purchaser of the copies was irrelevant...." Brief of Appellee at 10. Rather, ChartOne claims, the court properly determined that the purchase did not qualify as a consumer transaction because it did not have a "consumer purpose"—because, that is, the use of Ford's medical records in his personal injury lawsuit did not constitute a "personal, household, or family use." D.C.Code § 28–3901(a)(2). Ford deems that rationale erroneous as well.

■ We agree with Ford that neither suggested rationale is consistent with the

---

**8.** Subsection (k)(1), which formerly authorized "any consumer" to bring suit, *see District Cablevision*, 828 A.2d at 723, was amended in 2000 to expand the potential plaintiff class so as to permit representative actions on behalf of consumers. The subsection currently reads as follows:

(k)(1) A person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia and may recover or obtain the following remedies:

(A) treble damages, or $1,500 per violation, whichever is greater, payable to the consumer;

(B) reasonable attorney's fees;

(C) punitive damages;

(D) an injunction against the use of the unlawful trade practice;

(E) in representative actions, additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice; or

(F) any other relief which the court deems proper.

D.C.Code § 28–3905(k)(1). As used in subsection (k)(1), the term " 'trade practice' means any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services[.]" D.C.Code § 28–3901(a)(6).

CPPA, this jurisdiction's case law, and other applicable authority. To begin with, that it was Ford's attorney who consummated the transaction with ChartOne is immaterial. In effectuating the purchase of Ford's medical records, the attorney was acting on his client's behalf and with his authorization—in other words, as Ford's agent. *See Lex Tex Ltd., Inc. v. Skillman,* 579 A.2d 244, 250 (D.C.1990) ("In general, the relation of attorney and client is one of agency and the general rules of law applicable to agencies apply.") (internal quotation marks, brackets and citations omitted). Under agency principles, *the authorized acts of an attorney on behalf of a client are imputed to the client.*[9] We see no reason to make an exception to that general rule for purposes of the CPPA. It was Ford, not his attorney, who provided the "economic demand" for the purchase of his medical records, *see* D.C.Code § 28–3901(a)(2) (defining "consumer"), who ultimately paid ChartOne's price, and who was injured if that price was exorbitant. It was Ford, moreover, not his attorney, to whom the records belonged. *See In re Douglass,* 859 A.2d 1069, 1085 (D.C.2004); D.C. Rules of Prof. Conduct 1.8(i), 1.16(d). The attorney had little if any economic stake of his own in the transaction and correspondingly little *incentive to object to any overcharges* (which simply were passed along to Ford).[10] In short, as a matter of economic reality, Ford was the true purchaser. His attorney's involvement as an intermediary therefore did not shield the transaction

from the CPPA, for that statute applies whether a merchant makes a sale to a consumer "directly or indirectly." D.C.Code § 28–3901(a)(3) (defining the term "merchant"); *id.* § 28–3901(a)(6) (defining "trade practice").

In nonetheless describing the purchase of Ford's medical records as a business transaction by his attorney, the trial court cited the decision of the Supreme Court of Michigan in *Slobin, supra.* The majority in *Slobin* held that the Michigan Consumer Protection Act did not apply when a law firm purchased its client's medical records for use in litigation because the firm sought those records "principally [to] engage in its own business or commercial enterprise, namely, the evaluation and pursuit of legal avenues to procure financial rewards and other relief for its client." 666 N.W.2d at 635. This rationale is flawed, in our view, because it ignores the nature of the attorney-client relationship and the underlying economic reality of the transaction; as the dissenting judge in *Slobin* pointed out, the law firm was acting as the client's agent. *Id.* at 636 (Kelly, J., dissenting) ("Here, [the law firm] sought plaintiff's medical records while acting in its representative capacity and with plaintiff's consent. Under agency theory, the request by the law firm to defendant is treated as having been made by plaintiff to defendant."). So far as we are aware, the analysis of the *Slobin* majority has not commended itself to courts in other juris-

---

9. *See, e.g., Lex Tex,* 579 A.2d at 250 ("To the extent, then, that any petitioning of the government was taking place, it was that of the appellant [the client], not appellees [the attorneys]."); *Lynch v. Meridian Hill Studio Apts., Inc.,* 491 A.2d 515, 520 (D.C.1985) (explaining why "it is appropriate to impute an attorney's mistake of law to the client under most circumstances"); *see also Makins v. District of Columbia,* 861 A.2d 590, 593 (D.C.2004) (en banc) ("Agency principles are applied to

determine whether the attorney or agent had authority to bind his principal [the client] to the settlement contract.").

10. For these reasons, an attorney's purchase on behalf of a client is different from an attorney's purchase of, say, office supplies on his own behalf. *Cf. Mazanderan,* 700 F.Supp. at 591.

dictions.[11]

We disagree as well with the contention that because Ford acquired his medical records to seek a financial recovery in his personal injury lawsuit, he did not obtain them "for personal, household, or family use." D.C.Code § 28–3901(a)(2). Using medical records to secure compensation for injuries in a lawsuit is no less "personal" than is using them to secure insurance coverage or, for that matter, a second medical opinion, employment, medical leave, and other personal benefits. A motive may be pecuniary and still be personal. Revealingly, the CPPA recognizes explicitly that the "goods and services" involved in a consumer transaction may concern "any and all parts of the economic output of society, ... includ[ing] consumer credit, franchises, business opportunities, real estate transactions, and consumer services of all types." D.C.Code § 28–3901(a)(7). The specific inclusion of "franchises" and "business opportunities" in this definition demonstrates unequivocally that the consumer in a consumer transaction is allowed to have a financial motive. If the CPPA applies to a consumer's purchase of a "business opportunity," we are hard pressed to see why it would not apply to a consumer's purchase of his medical records for his personal injury lawsuit.

It is true that the CPPA does not protect merchants in their commercial dealings with suppliers or other merchants. *See, e.g., Mazanderan, supra.* But Ford's activity was not akin to that of a merchant. The term " 'merchant' means a person who does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice." D.C.Code § 28–3901(a)(3). That definition cannot be stretched to fit Ford merely because he engaged in litigation with a financial objective.

We essentially settled the question of how to determine whether a transaction is a consumer transaction for purposes of the CPPA in *Adam A. Weschler & Son, Inc. v. Klank,* 561 A.2d 1003 (D.C.1989). In that case, the purchaser of an antique chest at a public auction charged the auction house with an unlawful trade practice under the CPPA, alleging that it had misrepresented the chest in its auction catalog. The auction house argued that the sale was not a consumer transaction because the purchaser, Klank, bought the chest as an investment and intended to resell it. We held that even if Klank did make the purchase to seek a financial gain, the transaction was subject to the CPPA because he was

---

11. *See Mermer v. Medical Correspondence Servs.,* 115 Ohio App.3d 717, 686 N.E.2d 296, 299–300 (1996) (holding that attorneys are agents of their clients and that the purchase of medical records by an attorney is actually a purchase by the client himself and thus is subject to the state's consumer protection laws); *see also Street v. Smart Corp.,* 157 N.C.App. 303, 578 S.E.2d 695, 699 (2003) (refusing to allow an attorney to bring suit against medical records provider because the clients were the ones who would bear the unconscionably high cost of the records); *Cruz v. All Saints Healthcare Sys.,* 242 Wis.2d 432, 625 N.W.2d 344, 350 (Ct.App.2001) (concluding that even though lawyers request and pay for their clients' medical records, the clients are the proper parties in a consumer protection suit, since the clients will eventually reimburse the attorneys); *Pratt v. Smart Corp.,* 968 S.W.2d 868, 873 (Tenn.Ct.App. 1997) (stating that "the fact that it was Pratt's attorney, rather than Pratt herself, who received the records and paid the invoice presents no obstacle to Pratt's claim, since her attorney clearly acted on her behalf in obtaining the records").

not in the regular business of buying and selling such goods:

> [I]t is not the use to which the purchaser ultimately puts the goods or services, but rather the nature of the purchaser that determines the nature of the transaction. If the purchaser is regularly engaged in the business of buying the goods or service in question for later resale to another in the distribution chain, or at retail to the general public, then a transaction in the course of that business is not within the Act. If, on the other hand, the purchaser is not engaged in the regular business of purchasing this type of goods or service and reselling it, then the transaction will usually fall within the Act. Since Klank is not in the regular business of the retail sale of antiques, it follows that the transaction is one within the Act and its protections.

*Id.* at 1005 (footnote omitted). The same reasoning applies with full force in the present case. Notwithstanding his pecuniary motivation, Ford did not purchase his medical records from ChartOne as part of a "regular business of purchasing ... and reselling" such records. As we said, "it follows that the transaction is one within the Act and its protections." [12]

In sum, we are persuaded, as a matter of law, that Ford engaged in a consumer transaction with ChartOne within the coverage of the CPPA. Accordingly, we must reverse the trial court's award of summary judgment to ChartOne.

## B. The Denial of Class Certification

■ The burden is on the party seeking class certification to show that the requirements of Rule 23(a) and at least one subdivision of Rule 23(b) are satisfied. *Yarmolinsky v. Perpetual Am. Fed. Sav. & Loan Ass'n,* 451 A.2d 92, 94 (D.C.1982). "Whether that burden has been met is a matter entrusted to the trial court's discretion, and its decision will not be reversed unless that discretion has been abused." *Cowan v. Youssef,* 687 A.2d 594, 602 (D.C. 1996). Broadly speaking, in reviewing whether a trial court "abused" its discretion—or, less pejoratively but more aptly, exercised its discretion erroneously—our task is to "determine 'whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion.' " *Johnson v. United States,* 398 A.2d 354, 365 (D.C. 1979) (citation omitted). A discretionary judgment "must ... be founded upon correct legal principles," *In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991), and a court " 'by definition abuses its discretion when it makes an error of law.' " *Allen v. Yates,* 870 A.2d 39, 50 (D.C.2005) (quoting *Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)). Thus, a denial of class certification resulting from a failure to follow proper legal standards is an abuse of discretion. *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 162 (2d Cir.2001).

■ When we find that a trial court's discretionary decision is "supported by improper reasons, reasons that are not founded in the record, or reasons which contravene the policies meant to guide the

---

**12.** ChartOne points out that *Weschler* did not set forth an ironclad rule; it said only that if the purchaser is not engaged in the regular business of buying and reselling the goods in question, the transaction will "usually" be subject to the CPPA, not that it always will be. A purchase of supplies or equipment for a business operation, for example, might be exempt even though such goods would not be resold. *See Mazanderan,* 700 F.Supp. at 591. But even if a purchase made to facilitate the commercial activity of a merchant is not a consumer transaction within the meaning of the CPPA, that is not this case.

trial court's discretion or the purposes for which the determination was committed to the trial court's discretion, reversal likely is called for." *Johnson*, 398 A.2d at 367 (citation omitted). Ordinarily, we may not salvage an unsound discretionary ruling by substituting our own reasons for those of the trial court. *See Wright v. United States*, 508 A.2d 915, 920 (D.C.1986); *accord, Randolph v. United States*, 882 A.2d 210, 218 (D.C.2005) (observing that when "we are dealing with ... issues which are confided to the discretion of the trial court, affirmance on an alternate ground is difficult to defend").

In denying Ford's motion for class certification, the trial court determined that the action did not satisfy the threshold requirements of Rule 23(a) for two reasons: because Ford obtained his records for litigation, and because ChartOne's liability under the CPPA to members of the proposed class would turn on factual questions unique to each class member. Based on the latter reason, the court also determined that the action did not meet the additional requirements of Rule 23(b)(3). The court decided that the lawsuit could not proceed as a class action under Rule 23(b)(2) for the additional reason that the relief sought was primarily monetary. To examine the validity of these reasons and decide whether the trial court abused its discretion in reaching its conclusions, we must review the relevant requirements of Rule 23.

### 1. Rule 23(a)

▮▮▮▮▮ The trial court concluded that Ford's proposed class action would not satisfy the commonality, typicality and adequacy-of-representation requirements of Rule 23(a).[13] As the Supreme Court has explained in construing the counterpart federal rule,[14] these three requirements overlap:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The core concept underlying the class action device is found in the requirement of Rule 23(a)(2) that there be questions of law or fact common to the class. To satisfy this requirement, "[i]t is not necessary that every issue of law or fact be the same for each class member." *Bynum v. District of Columbia*, 214 F.R.D. 27, 33 (D.D.C.2003) (citations omitted). "[F]actual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members." *Id.* (citations omitted). The members of a proposed class of plaintiffs raise a common

---

**13.** See note 3, *supra.* Neither the trial court nor ChartOne has disputed Ford's showing that the numerosity requirement of Rule 23(a)(1) is satisfied.

**14.** Because Superior Court Civil Rule 23 is derived from the same numbered Rule in the Federal Rules of Civil Procedure, *see* D.C.Code § 11–946 (2001), we construe it "in light of the meaning of that federal rule." *Taylor v. Washington Hosp. Ctr.,* 407 A.2d 585, 590 n. 4 (D.C.1979).

question of law or fact where "the same evidence will suffice for each member to make a prima facie showing" of the defendant's liability. *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir.2005) (citation omitted). If, however, proving a defendant's liability requires "the members of a proposed class ... to present evidence that varies from member to member, then it is an individual question." *Id.*

■■■■■ Much the same is true of Rule 23(a)(3)'s requirement that the claims or defenses of the representative parties be typical of the claims or defenses of the class. "[T]he typicality requirement focuses on whether the representatives of the class suffered a similar injury from the same course of conduct." *Bynum*, 214 F.R.D. at 34. "Essentially, the class representative's claim is typical of the claims of the class if his or her claim and those of the class arise from the same event or pattern or practice and are based on the same legal theory." *Singer v. AT & T Corp.*, 185 F.R.D. 681, 689 (S.D.Fla.1998) (internal quotation marks and citation omitted). The "purpose" of typicality "is to 'ensure[ ] that the claims of the representative and absent class members are sufficiently similar so that the representatives' acts are also acts on behalf of, and safeguard the interests of, the class.'" *Bynum*, 214 F.R.D. at 34 (citation omitted). If that purpose is achieved, then as with commonality, "[f]actual variations between the claims of class representatives and the claims of other class members ... do not negate typicality." *Id.*; see also *United States v. Trucking Employers, Inc.*, 75 F.R.D. 682, 688 (D.D.C.1977) ("[W]here the claims or defenses raised by the named parties are typical of those of the class, differences in the factual patterns underlying the claims or defenses of individual class members will not defeat the action.") (citing cases). Similarly, "differences in the amount of damages

claimed, or even the availability of certain defenses against a class representative may not render his or her claims atypical." *Singer*, 185 F.R.D. at 689.

■■■■■ The adequacy-of-representation requirement in Rule 23(a)(4) obliges the representative parties to assure the court that they "will fairly and adequately protect the interests of the class." "Two criteria for determining the adequacy of representation are generally recognized: 1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 326 U.S.App. D.C. 17, 21, 117 F.3d 571, 575 (1997) (quoting *National Ass'n of Regional Medical Programs, Inc. v. Mathews*, 179 U.S.App. D.C. 154, 159, 551 F.2d 340, 345 (1976)). "[W]here the court can fairly conclude that by pursuing their own interests vigorously the named representatives will necessarily raise all claims or defenses common to the class, representativeness will be satisfied." *Trucking Employers*, 75 F.R.D. at 688.

## 2. Rule 23(b)

■■■■ An action that satisfies the prerequisites of Rule 23(a) may be maintained as a class action provided that it also meets the requirements of one or more of the three subdivisions of Rule 23(b). Ford contended that his action satisfied subdivisions (b)(2) and (b)(3). The subdivisions are not mutually exclusive; a class may be certified under more than one of them. *Eubanks v. Billington*, 324 U.S.App. D.C. 41, 45, 110 F.3d 87, 91 (1997). "However, there are important procedural distinctions between the (b)(1) and (b)(2) actions and

the (b)(3) action." *Id.*, 324 U.S.App. D.C. at 46, 110 F.3d at 92. In particular,

> Rule 23(c)(2) provides that all class members in a(b)(3) action are entitled to notice and an opportunity to exclude themselves from the class and the preclusive effect of any judgment by "opting out" of the lawsuit. The rule has no comparable provision for (b)(1) and (b)(2) classes.

*Id.*

### a. The (b)(2) Class Action

When "[t]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole," a class may be certified under Rule 23(b)(2). "The (b)(2) class action is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Robinson*, 267 F.3d at 162. *See* 7AA CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1775 at pp. 71 *et seq.* (3d ed. 2005) (hereinafter, "WRIGHT, MILLER & KANE"). Ancillary monetary relief also may be granted in a(b)(2) action (back pay, for instance, in a suit seeking an end to employment discrimination). Importantly, however, subdivision (b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." FED.R.CIV.P. 23(b)(2), advisory committee note (1966); *see generally* WRIGHT, MILLER & KANE, § 1775 at pp. 61 *et seq.* The reason for this limitation has to do with the general preclusion of opt-outs

in class actions intended to remedy class-wide injuries by means of sweeping injunctive relief. "Where (b)(2) class members seek monetary relief ... conflicts of interest may emerge, and the assumptions of homogeneity and class cohesiveness that underlie (b)(2) certification can begin to break down." *Eubanks*, 324 U.S.App. D.C. at 48, 110 F.3d at 94.

Courts have divided over how to determine whether accompanying claims for monetary relief predominate over claims for injunctive or declaratory relief. *Compare Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998) (holding that monetary relief predominates in a proposed (b)(2) class action unless it is "incidental," meaning that it "flow[s] directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief") (emphasis in the original) *with Robinson*, 267 F.3d at 164 (rejecting strict *Allison* approach in favor of "an ad hoc balancing that will vary from case to case"). "[A]t a minimum," however, in order to certify a(b)(2) class, the trial court must be satisfied that "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Robinson*, 267 F.3d at 164. "Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery." *Id.*[15]

---

**15.** Where a *bona fide* (b)(2) class seeks individual monetary relief, the trial court has discretion to "certify[] a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief, effectively granting (b)(3) protections

including the right to opt out to class members at the monetary relief stage." *Eubanks*, 324 U.S.App. D.C. at 50, 110 F.3d at 96. *See generally* WRIGHT, MILLER & KANE, § 1784.1. This so-called "hybrid" approach "requires satisfaction of both the (b)(2) and (b)(3) re-

### b. The (b)(3) Class Action

Class actions seeking mainly monetary relief usually fall under Rule 23(b)(3), which not only implicates class member notification and opt-out rights but also mandates additional findings by the trial court. Specifically, a (b)(3) class may be certified only if the court finds "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Super. Ct. Civ. R. 23(b)(3).

■ As to the first condition for a (b)(3) class, "[t]here is no magic formula" for determining whether the common questions "predominate." *Bynum,* 214 F.R.D. at 39. Predominance tends to be established "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 262 (D.D.C.2002) (internal quotation marks and citation omitted). Conversely, "if the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." WRIGHT, MILLER & KANE, § 1778 at p. 134. But the common questions need not necessarily be dispositive to satisfy subdivision (b)(3). If "the defendant's activities present 'a common course of conduct' so that the issue of statutory liability is common to the class, the fact that damages ... may vary for each party does not require that the class be terminated as being beyond the scope of Rule 23(b)(3)." *Id.* at 124–25. Accord, *Bynum,* 214 F.R.D. at 39. Similarly, even as to questions of liability,

"[t]he existence of individual questions that are ministerial in nature or otherwise easy to resolve does not defeat a certification petition." *Wells v. McDonough,* 188 F.R.D. 277, 279 (N.D.Ill.1999) (internal quotation marks and citation omitted).

■ The second condition of Rule 23(b)(3), that a class action be superior to other available methods of adjudicating the controversy, is related to the first. As the *Bynum* court stated:

"Rule 23(b)(3) favors class actions where common questions of law or fact permit the court to 'consolidate otherwise identical actions into a single efficient unit.'" *Wells v. Allstate Ins. Co.,* 210 F.R.D. 1, 12 (D.D.C.2002).... [Citation omitted] It has often been observed that class treatment is appropriate in situations ... in which the individual claims of many of the putative class members are so small that it would not be economically efficient for them to maintain individual suits.

214 F.R.D. at 40. Assuming that the predominance requirement is satisfied, "if the interested parties are so numerous that their joinder or intervention would burden the court or the number of individual actions would be quite large, a Rule 23(b)(3) action should be allowed." WRIGHT, MILLER & KANE, § 1779 at p. 163.

Consumer actions alleging various types of systematic overcharging often have been certified as (b)(3) class actions under the foregoing principles. *See, e.g., District Cablevision,* 828 A.2d at 719 (class action certified in connection with challenge by cable television subscribers to excessive late fees); *Singer,* 185 F.R.D. at 692 (class action by long-distance telephone customers alleging over-billing for multiple phone lines). We also are aware of at least two such class actions against medical records

quirements." *Lott v. Westinghouse Savannah* *River Co.,* 200 F.R.D. 539, 563 (D.S.C.2000).

production services. *See Cruz, supra* note 11; *ChartOne, Inc. v. Bernini,* 207 Ariz. 162, 83 P.3d 1103 (Ct.App.2004).

### 3. The Trial Court's Reasons for Denying Class Certification

Ford argued that he satisfied all the foregoing requirements of Rules 23(a), 23(b)(2) and 23(b)(3). The common, predominating question that he sought to raise was whether ChartOne systematically charged him and numerous other District of Columbia customers unconscionably high fees for copies of their medical records. He alleged that ChartOne was persisting in this practice, making declaratory and injunctive as well as monetary relief appropriate. Having sustained the same type of individually small (but, in the aggregate, large) monetary injury as all the other members of the proposed plaintiff class from the same course of conduct by ChartOne, Ford asserted that his claim was typical, that he would represent the class fairly and adequately with experienced counsel, and that a class action would be superior to any other method of resolving the controversy.

■ The first ground the trial court gave for denying class certification was essentially the same ground on which the court later granted summary judgment to ChartOne. To state a claim under the CPPA, the court reasoned, members of the proposed class would have to establish that they purchased their medical records from ChartOne for a consumer purpose, but Ford purchased his records for the non-consumer purpose of his personal injury lawsuit. As a result, the court concluded, the requisite commonality was lacking. This rationale, if it were valid, also would serve as a basis for attacking typicality and Ford's adequacy as a class representative (not to mention the requirements of Rule 23(b)(3)). As we have discussed above, however, the rationale is not valid. It is erroneous as a matter of law, because Ford's purpose *was* a consumer purpose within the meaning of the CPPA.

It might be suggested that a class should not be certified because it would necessitate individualized inquiry into whether each potential class member, not just Ford, obtained medical records from ChartOne primarily for personal, household, or family use. At least on the present state of the record, however, this concern is too insubstantial to support the denial of class certification. In all likelihood, practically speaking, the posited inquiries should prove to be unnecessary, for whatever particular reasons motivated patients or their representatives to purchase their medical records from ChartOne, it is hard to imagine that any plausible reason fairly could be characterized as other than personal or familial. We are far from persuaded, moreover, that any individualized inquiry that might be needed would be unduly burdensome. *See, e.g., Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1165 n. 4 (7th Cir.1974) ("Even if it is necessary to review the contracts individually to eliminate business purchases, as was pointed out in *Beard v. King Appliance Co.,* 61 F.R.D. 434, 438 (E.D.Va.1973), 'such a task would be neither herculean, inhibiting, nor for that matter ... unique.'"); *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, L.L.C.,* 198 F.R.D. 503, 506 (N.D.Ill.2001) (citing *Haynes,* and pointedly adding that "[i]f the need to show whether each loan transaction was a consumer rather than a commercial one barred a class action, there could be no FDCPA [Fair Debt Collection Practices Act] class actions, because only consumer loans come under FDCPA."); *Wells,* 188 F.R.D. at 279 ("The fact that class certification here may require the parties to ask the individual class members one question [to distinguish between per-

sonal and business debts] does not automatically establish that individual issues 'predominate' over the common issues of the class.").

 In concluding that Ford's proposed class action did not meet the typicality and adequacy-of-representation requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b)(3), the trial court relied on a second ground: that ChartOne's liability for allegedly unconscionable pricing would have to be determined separately with respect to each member of the proposed class because of individual variations in each member's medical problems and treatment. The premise of this ruling was that since the actual cost to ChartOne of producing a patient's medical records varies depending on the patient's particular medical history, the value of the service that ChartOne provided and hence the fairness of the fee that it charged also varied with each records request. For example, ChartOne states in its brief, "while a $25.00 clerical fee will be considered as extremely low for those requestors who have heightened privacy issues (*e.g.*, psychiatric admissions, drug and alcohol abuse, or AIDS) which invoke strict federal, state, internal and external rules and regulations and which require heightened scrutiny by multiple ChartOne employees, it may be perceived as higher *for an individual who has no such privacy concerns.*" Brief of Appellee at 17.

The fairness of ChartOne's fees is not to be determined by comparing prices with costs on a case-by-case basis, however.

That approach reflects a misconception as to how the lawfulness of uniform prices is to be evaluated. This error undermines the foundation of the trial court's ruling, requiring reversal.

 Generally speaking, in order to show that a price was unconscionably high, the buyer must establish that the price was "unreasonably favorable" to the seller (and also, almost always, that the buyer did not have a meaningful choice of alternatives under the circumstances). *Urban Invs., Inc. v. Branham*, 464 A.2d 93, 99 (D.C.1983) (quoting *Williams v. Walker–Thomas Furniture Co.*, 121 U.S.App. D.C. 315, 319, 350 F.2d 445, 449 (1965)); *accord, Lund v. Watergate Investors Ltd. P'ship*, 728 A.2d 77, 84 (D.C.1999). For the purpose of determining whether a price is unreasonably favorable to the seller, the CPPA states that a factor to consider is whether there was a "gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees[.]" D.C.Code § 28–3904(r)(3); *see Lund, supra.* Thus, to evaluate a claim that a seemingly high price is illegally excessive, it is relevant to investigate the prices charged similarly situated consumers by the seller's competitors, and by the seller itself, particularly under competitive market conditions. But this factor is not the only consideration. The trial court was not wrong to recognize that the seller's cost of doing business may also be relevant. The court did not approach that factor correctly, however.[16]

---

16. We do not need to address the second prong of an unconscionable pricing claim, whether the buyer had a meaningful choice of alternatives. That issue often turns on whether the merchant "has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors."

ChartOne allegedly priced its services by setting uniform clerical, per page, and shipping fees for the medical records requests that it handled. Being uniform, those fees did not vary in each transaction to reflect the fluctuating costs attributable to the medical history of the particular patient whose records were involved in the transaction. The legitimacy, in principle, of charging uniform fees across the board in lieu of individualized fees is not in doubt; indeed, businesses usually find it utterly impractical to charge each customer a different fee based on all the varying actual costs of fulfilling an order. The question of whether a uniform price is unreasonably favorable to the seller, *i.e.,* enables the seller to reap an exorbitant, non-competitive return, therefore cannot be answered one transaction at a time by comparing the uniform fees charged in each transaction with the actual, fluctuating costs allocable to that transaction. As to any given transaction, that is not an informative comparison. This is not to say that ChartOne's costs of servicing records requestors are irrelevant. It is to say that in evaluating the reasonableness of the company's uniform clerical, copying, and shipping fees in relation to its costs, the relevant comparison is to the company's *average* costs. *See, e.g., District Cablevision,* 828 A.2d at 724–25 (upholding a finding that the defendant cable company's

standard "late fee" was unconscionably high where it was more than twice the average cost that the company incurred as a result of each delinquent payment).[17]

A separate price-cost comparison therefore does not have to be carried out with respect to each class member's transaction. The relevant comparison is essentially the same for each member of the proposed plaintiff class, which is to say it calls for common proof.[18] As the individual cost variations cited by the trial court thus are immaterial, the court erred in finding that they justified the denial of class certification.

■■■ That ChartOne's pricing scheme in fact may not have been perfectly uniform throughout the proposed class period does not alter our conclusion. ChartOne proffers, apparently for the first time on appeal, that its fees have varied somewhat depending on the particular health care provider and time period involved and the type of request or requestor. For example, ChartOne represents in its brief that it charged some requestors $1.00 per page rather than the $1.10 per page that it charged Ford. Moreover, ChartOne asserts, it revised its pricing in 2003 (after Ford had filed his complaint) to comply with federal regulations that were issued under the Health Insurance Portability

D.C.Code § 28–3904(r)(5). In the instant case, there is no dispute that members of the proposed class had no alternative to paying ChartOne's fees if they wanted to obtain their medical records. For each health care provider with which it had a contract, ChartOne enjoyed a monopoly in the servicing of records requests.

17. Thus, the trial court in *District Cablevision* certified the class of cable subscribers who had been charged late fees even though the actual costs of collection varied from customer to customer.

18. Nor is it necessary to consider individual cost variations in order to calculate the compensatory damages to which the plaintiff class might be entitled. Conceptually speaking, the measure of each class member's damages is simply the difference between the unconscionably high uniform fees that the class member paid and what the trier of fact finds would have been reasonable uniform fees. (In determining the seller's average costs and undertaking the relevant price-cost comparisons, there of course may be accounting and other issues to work through. Such issues are beyond the scope of the present discussion.)

and Accountability Act of 1996 ("HIPAA"). These regulations capped the fees patients legally could be charged for their medical records. *See* 45 C.F.R. § 164.524(c) (limiting the "reasonable, cost-based fee" that an "individual" may be charged for a copy of his medical records to "only" the cost of copying and postage). In accordance with those caps, ChartOne claims that it has lowered its fees to patient requestors to $.28 per page plus actual postage. (ChartOne construes the HIPAA regulation as not imposing its fee caps on transactions with attorney requestors such as Ford's attorney, however. *See Bugarin v. ChartOne, Inc.*, 135 Cal.App.4th 1558, 38 Cal. Rptr.3d 505 (2006)).

■ We recognize that the foregoing facts theoretically could have a bearing on whether the requirements of Rule 23 are satisfied, perhaps by causing Ford to have a conflict of interest with some members of the proposed plaintiff class. However, ChartOne did not bring these facts to the attention of the trial court, nor did that court consider them. As a result, the record does not permit our informed consideration of them either. Moreover, a few categorical variations in the otherwise uniform fees that ChartOne has charged since 1999 would not necessarily give rise to conflicts or otherwise preclude Ford from maintaining his proposed class action.[19] The advent of the HIPAA regulations in 2003 and the resultant changes in ChartOne's pricing might well justify limiting

any plaintiff class represented by Ford to persons who requested their records before the regulations went into effect, without necessitating a total denial of class certification. Given the current undeveloped state of the record, we leave these matters to the discretion of the trial court on remand. We note that a class certification order "may be conditional and may be altered or amended before the decision on the merits" if it later appears following discovery that the certification was improvidently granted. Super. Ct. Civ. R. 23(c)(1); *see Singer*, 185 F.R.D. at 685.

■ Finally, the trial court declined to certify a(b)(2) class on the additional ground that this is predominantly an action for monetary rather than injunctive (or declaratory) relief. We agree with that ruling. "[I]n the absence of a possible monetary recovery," *Robinson*, 267 F.3d at 164, this class action would not have been brought. It may be that some members of the plaintiff class—persons who already have purchased and received their medical records from ChartOne—can predict that they will need to request their records from the company again (for example, if they need supplemental records of continuing medical treatment for on-going litigation in which they are involved). We have no reason to think, however, that this need to request additional records at some future time is anything more than a speculative possibility for most class members

---

19. Ford argues that, at most, such variations might provide a reason to create sub-classes, each of which could contain members of the original class who paid the same flat fees. *See* Super. Ct. Civ. R. 23(c)(4)(B) ("When appropriate ... a class may be divided into subclasses and each subclass treated as a class ...."); *see, e.g., Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir.1977) (holding, in a nationwide price-fixing case, that variations from jurisdiction to jurisdiction in the difference between the fixed price and the free market price would not defeat commonality but would be a reason to create subclasses). Without having more information about the nature and range of the fees that ChartOne has charged, we are unable to express an opinion on the propriety of sub-classes in this case. Caution is in order in creating subclasses; among other things, any sub-class "must independently meet" all the requirements of Rule 23, including the adequacy-of-representation requirement of Rule 23(a). WRIGHT, MILLER & KANE, § 1790 at p. 608.

(including Ford). We likewise have no reason to suppose that the indeterminate class of persons who will request their medical records from ChartOne in the future constitutes a subgroup of the plaintiff class (or, again, that it includes Ford). On the contrary, the two classes are different and the extent to which they overlap at all is unknown and unknowable. As opposed to monetary compensation for past overpayments, therefore, injunctive relief to prevent ChartOne from overcharging customers in the future is of comparatively little interest or value to the plaintiff class that Ford would represent (even if it would be of some value to a few class members). Monetary relief will suffice to make the members of this class entirely whole for any past wrongs they have suffered. As a practical matter, moreover, we think it fair to assume that an award of damages against ChartOne would lead it to change its pricing even without the issuance of an injunction directing it to do so.[20]

### III.

We reverse the award of summary judgment to ChartOne and, to the extent stated above, the denial of Ford's motion for class certification. The case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*

---

**20.** As there is no serious claim or need for class-wide injunctive relief in addition to individualized monetary relief, there is no merit to Ford's suggestion that a hybrid (b)(2)-(b)(3) class should be created. See footnote 15, *supra.*